994 So.2d 322 (2007)
Donald L. BERG, etc., Appellant,
v.
Julio C. CAPO, Appellee.
Nos. 3D05-2004, 3D05-1354.
District Court of Appeal of Florida, Third District.
November 14, 2007.
Rehearing and Rehearing En Banc Denied November 6, 2008.
Jorden Burt and Jeffrey B. Crockett; Lauri Waldman Ross, Miami, for appellant.
Holland & Knight and Rodolfo Sorondo, Jr., and Christopher N. Bellows, Miami, for appellee.
Before WELLS, SHEPHERD, and ROTHENBERG, JJ.
WELLS, Judge.
Donald L. Berg appeals from summary judgments granted in Julio Capo's favor on claims sounding in breach of fiduciary duty, fraud, declaratory judgment, securities fraud, and rescission relating to a stock purchase agreement executed by the parties on January 21, 1999.[1] Because that agreement contains both an integration clause and a clause mutually releasing Berg and Julio Capo "from any and all claims, demands, charges, impositions, damages, collections, etc., of any type or description, arising out of any and all acts, deeds, contracts, undertakings, representations, or any other thing, of any type or description," the judgments in Julio Capo's favor must be affirmed.
Berg nevertheless maintains that he is entitled to rescind the January 21 agreement (and therefore secure reversal on his other claims) not because of the fraud he actually alleged in his complaint as the basis for setting aside this agreement, but because Berg's attorney, Sidney Brodie, *323 also represented Julio's cousin, Gerry Capo, and was part of a conspiracy to benefit Gerry via this agreement between Julio and Berg. Unfortunately for Berg, no conspiracy is alleged in his complaint, nor was this conspiracy/dual representation theory asserted as a basis for setting aside this agreement. Moreover, no dual representation or conflict was demonstrated. It is undisputed that Berg gave a power of attorney to Gerry Capo to act on his behalf in this transaction. Both Berg and Gerry were represented by the same attorney, thus creating no conflict. It is also undisputed that Julio was represented by someone else. Again, there was no dual representation or conflict. The January 21, 1999 agreement and its release therefore stand and bar Berg's claims regarding this transaction.
The judgments on appeal are, therefore, affirmed.
SHEPHERD, J., concurs.
ROTHENBERG, Judge (dissenting).
The complaint filed by Donald Berg ("Berg") against Julio C. Capo ("Julio"); Julio's cousin, Gerardo Capo ("Gerry"); and three companies they jointly owned, B.C.C. Enterprises, Inc., RAU Enterprises, Inc., and Atlantic Land Holdings, Inc., alleges that Berg, Julio, and Gerry were partners in a number of real estate development ventures since 1985. The responsibilities of each partner were assigned as follows: Gerry handled the day-to-day management of the partnership, Julio managed the cash flow, and Berg provided the investment capital. Over the years, Berg invested millions of dollars with Gerry and Julio (collectively "the Capos"). Their general method of operation was informal and based upon trust. Although they were equal partners, sharing equally in the profits, there were no written shareholder agreements between them, and when Julio needed operating capital, he simply called Berg, who would send the money requested without asking for or receiving any written proof.
The lawsuit stems from two ventures the parties entered into for: (1) the purchase and development of 640 acres of raw land ("the Section 7 venture"); and (2) the purchase and development of approximately 500 acres on the Island of Bimini in the Bahamas ("the Bimini venture"). In the instant appeal, Berg seeks reversal of several orders issued by the trial court granting summary judgment in favor of Julio regarding the Bimini venture. The trial court granted summary judgment as to Count I for breach of fiduciary duty; Count IV for rescission of the January 21, 1999, Stock Purchase Agreement; Count V for declaratory relief; Count VI for fraud; and Count VII for securities fraud.
In the complaint, Berg alleges that the Capos set up a corporation, RAV Bahamas Ltd. ("RAV Bahamas"), to be used for the Bimini venture; that Berg contributed more than $1.3 million to RAV Bahamas; and that Berg was promised one-third of the stock ownership of RAV Bahamas to induce him to make the initial $750,000 investment. Berg further alleges that despite his substantial monetary contributions to RAV Bahamas for the Bimini venture and the Capos' promise that he would receive one-third of the company's stock, only two shares of RAV Bahamas stock were issued, each of the Capos received one of the two shares, and Berg did not receive the promised one-third of the company's stock. Additionally, the complaint alleges, and there is record evidence to support these allegations, including admissions from the Capos, that the money Berg gave to the Capos to invest in the Bimini venture was pocketed by the Capos. After pocketing Berg's money without his knowledge, the Capos continued to request and *324 receive funds from Berg to be placed in RAV Bahamas for the Bimini venture.
Berg claims that in 1998, the Capos told him that they had "signed up" Asian investors for the development of the Bimini property. Gerry told Berg that based upon the successful negotiations with the Asian investors, he wished to gain further interest in RAV Bahamas but Julio refused to sell Gerry any additional interest in the company, and instead, Julio was demanding that Gerry buy him out for $7 million. Gerry told Berg that he did not have the money.
Berg alleges that based upon misrepresentations and nondisclosures by the Capos regarding the alleged investors, the assets and liabilities of the company, and the shares issued and to whom, Berg was induced to purchase what he believed was all of Julio's shares and fifty percent of the stock in the company for $7 million.
In negotiating this transaction, Berg hired Sidney Z. Brodie ("Brodie") to represent him as his attorney. Brodie, however, failed to: (1) disclose to Berg that he was also Gerry's attorney and that he had been representing Gerry for approximately twenty-five years; (2) disclose to Berg that he represented RAV Bahamas, the company Berg was purchasing; or (3) warn Berg as to his clear conflicts of interest.
Brodie prepared the Stock Purchase Agreement ("Agreement"). Berg, who believed that his attorney, Brodie, was protecting his interests, signed the Agreement and paid Julio $7 million. What Berg actually purchased was only a portion of Julio's shares at a greatly inflated price. Julio allegedly then transferred his remaining shares to Gerry for ten dollars. The Capos then transferred debts the Capos had incurred through other companies the Capos owned into RAV Bahamas, thereby transferring their debts to Berg.
Subsequently, Brodie filed a petition for disciplinary resignation with the Florida Supreme Court, which was granted. Fla. Bar v. Brodie, 789 So.2d 349 (Fla.2001) (table); see also Fla. Bar v. Hale, 762 So.2d 515, 516-17 (Fla.2000) (stating that a disciplinary resignation is tantamount to disbarment).

SUMMARY JUDGMENT
The trial court concluded, and the majority agrees, that because the Agreement contains a release clause releasing and discharging any claims Berg may have regarding the Agreement, Berg is precluded from raising the instant claims against Julio. The release clause provides:
The parties hereto including Julio C. Capo, individually, in exchange of additional good and valuable consideration, the receipt and sufficiency thereof being mutually acknowledged by them, do hereby mutually release and discharge each other from any and all claims, demands, charges, impositions, damages, collections, etc. of any type or description, arising out of any and all acts, deeds, contracts, undertakings, representations, or any other thing, of any type of description, in regards to the operations of the Corporations and/or the Buyer prior to the execution of this Agreement or subsequent hereto as well as to the sale of stock in the Corporation as herein stated but for the payment of the remaining balance of money due as stated above.
The trial court additionally concluded that there was no record evidence that Julio made any misrepresentations to Berg or committed any acts of omission or commission upon which Berg justifiably relied regarding the Bimini venture.
Because (1) the complaint alleges that the Capos conspired in 1997 with one another *325 to deprive Berg of his rightful interest in the Section 7 venture and that they again conspired to defraud Berg regarding the Bimini venture; (2) the trial court found sufficient material evidence in dispute to deny summary judgment regarding Julio's involvement in the Section 7 venture and Gerry's involvement in both ventures; and (3) there is record evidence of Julio's involvement in a conspiracy to defraud Berg in the Bimini venture, the trial court erred in granting summary judgment in favor of Julio regarding the Bimini venture. Additionally, due to Brodie's clear conflict of interest; Brodie's failure to disclose that conflict to Berg; and Julio's failure to disclose Brodie's conflict and fiduciary duty to Gerry and RAV Bahamas, the Agreement, including the release clause, is subject to rescission and, therefore, it cannot shield Julio from Berg's claims against him.

EVIDENCE OF CONSPIRACY TO DEFRAUD BERG
Berg claims that the conspiracy between Julio and Gerry began with the Section 7 venture. The trial court found that there was record evidence regarding both Julio and Gerry's misrepresentations, omissions, and acts in support of Berg's claims against them in that venture.
The Capos and Berg were equal partners in the Section 7 venture. The complaint alleges that the Capos, without Berg's knowledge, entered into a joint venture with Mas Development, Inc. ("the Mas Group") to develop the Section 7 lands. Pursuant to the agreement with the Mas Group, Julio, Gerry, and Berg were to operate as managers along with three managers of the Mas Group. The Capos, however, failed to inform Berg about the joint venture or the agreement that he serve as one of the managers. Instead, the Capos appointed, in name only, Gerry's daughter and/or teenage son to act in that capacity, agreeing to pay a $10,000 monthly administrative fee, which Julio and Gerry divided between themselves.
When the Section 7 venture began to appreciate in value, the Capos allegedly conspired to obtain Berg's shares. The Capos told Berg that Gerry was going to sell his one-third interest to Julio for $1 million and Julio offered to purchase Berg's remaining one-third interest for $3 million. Gerry, however, did not actually intend to sell his one-third interest to Julio and there were three companies offering to buy the shares for $17 million. These misrepresentations were made to induce Berg to sell his one-third interest at a grossly undervalued amount. After inducing Berg to sell his one-third interest for $3 million, the Capos sold the company to the Mas Group for $17 million, with each of the Capos receiving nearly $9 million for the company.
After successfully swindling Berg in the Section 7 venture, the complaint alleges that the Capos conspired to defraud Berg in the Bimini venture. After taking Berg's initial $1.3 million investment in that venture and representing to Berg that his contributions entitled him to a one-third interest in that venture, the Capos told Berg that he, in fact, had purchased no shares in the company, but instead, was merely an investor. The company's records reflect that this representation was false. Gerry then told Berg that they had successfully negotiated with Asian investors, and if Berg wanted to purchase the company's stock, he could purchase Julio's fifty percent interest in RAV Bahamas for $7 million. It is at this point that Berg retained Brodie to represent him. Brodie, however, had represented Gerry for twenty-five years and was also representing the company Berg was buying into, RAV Bahamas. *326 No one, however, disclosed these conflicts to Berg, not Brodie nor the Capos, although they were all aware of Brodie's ties to Gerry and RAV Bahamas. Brodie's conflicts are critical, as he drafted the Agreement Berg executed, purchasing what Julio represented was fifty percent of the company's stock and which included the release clause at issue in this litigation. Brodie, who has been subsequently disbarred, failed to disclose to Berg that Julio was, in fact, only delivering to Berg four-fifths of his shares and selling his remaining one fifth of his shares to Gerry for $10. Brodie and the Capos also failed to disclose that the company had no contract with the alleged Asian investors and that the company had sizable debt. Although Brodie was retained to represent Berg, he drafted an agreement that protected Julio. The release clause was clearly drafted to benefit Julio.
The trial court concluded that while there was sufficient evidence to preclude summary judgment regarding Gerry's misrepresentations and fraudulent conduct, there was no evidence that Julio was involved in the scheme to defraud Berg in the Bimini venture. This was error.
Although the Capos represented to Berg that he had no shareholder interest in the company, the company's records reflect that Berg and the Capos invested equally in the company. Berg and Julio contributed $1.186 million and Gerry contributed $1.22 million in 1997, and RAV Bahamas' 1999 financial statement lists Berg's $1.278 million contribution to the company as a stockholder loan. Julio knew that Berg had a shareholder interest in the company, and therefore, fraudulently induced Berg to purchase an interest in the company he already possessed, and a greater share in the company than Julio possessed.
There is also record evidence as to Julio and Gerry's agreement to recoup losses they had incurred in other companies they owned by transferring these debts to RAV Bahamas, the company Berg was purchasing. Gerry actually testified regarding their plan to recoup these losses. These losses were added to RAV Bahamas' financial statements as debts RAV Bahamas owed. For example, $2.5 million was listed as "due to affiliates." One million eight hundred thousand dollars of this "debt" was due to Ameri-Housing, a management company wholly owned by Julio and Gerry, and $105,000 was "due to" Opac Bahamas, Gerry's construction company. Julio, who was an officer and the director of both Ameri-Housing and Opac Bahamas, could not account for these "debts" nor explain how they were added to RAV Bahamas' financial statements.
Thus, there is record evidence that Julio misrepresented to Berg the value of the company, in that he claimed that they had successfully negotiated with a group of Asian investors; misrepresented that he and Gerry owned one hundred percent of the shares of the company, even though the company listed Berg's contributions as shareholder loans; misrepresented that he was selling fifty percent of the company to Berg, even though he did not own fifty percent of company's stock and did not deliver all of his stock to Berg; conspired with Gerry to recoup losses they had incurred in other companies they owned by transferring these losses to RAV Bahamas; failed to disclose that Berg's lawyer, Brodie, was also the company's and Gerry's lawyer; and induced Berg to purchase the company's stock at a grossly inflated amount. Additionally, it is undisputed that Julio and Gerry did not invest Berg's earlier contributions to RAV Bahamas in RAV Bahamas. They admit that they divided the first $750,000 payment between themselves rather than investing it in RAV Bahamas.
*327 It was, therefore, error to grant summary judgment regarding Berg's fraud claims against Julio. Fraud may be established by either an intentional misrepresentation or omission of a material fact. Ward v. Atl. Sec. Bank, 777 So.2d 1144, 1146 (Fla. 3d DCA 2001). In Ward, this Court found that the fraud committed was based upon the omission of material facts, not misrepresentations by the bank's representative. Moreover, in Johnson v. Davis, 480 So.2d 625, 628 (Fla. 1985), the Florida Supreme Court suggested that there really is no meaningful distinction between misrepresentations and non-disclosure of material facts, when it stated as follows:
[W]here failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative representations is tenuous. Both proceed from the same motives and are attended with the same consequences; both are violative of the principles of fair dealing and good faith; both are calculated to produce the same result; and, in fact, both essentially have the same effect.
Even if there is no direct evidence that Julio, as opposed to Gerry, told Berg that he was not a shareholder when the company's records reflect otherwise, or that Asian investors were investing in the company, there is record evidence that Julio pocketed money Berg intended to be invested in the company, told Berg he was selling him fifty percent of the company when he did not have fifty percent to sell, and he did not even sell Berg all of his shares. Julio also failed to disclose Brodie's involvement with Gerry and the company. I would also find that there is sufficient circumstantial evidence to preclude summary judgment as to whether Julio, Gerry, and Brodie conspired together to defraud Berg. The settlement agreement reached between Julio and Gerry, which the trial court required them to produce, reflects that Julio often operated as Gerry's "straw man" in their various business dealings.

THE RELEASE CLAUSE DOES NOT PRECLUDE BERG'S CLAIMS
Julio claims that because the release clause specifically relinquishes "any and all claims ... arising out of any and all acts... in connection with the sale of stock," it precludes Berg's claims against Julio. Normally, this would be true, but under the particular facts of this case, because the Agreement itself is subject to being set aside if it is determined that Brodie was acting as an undisclosed agent of the Capos, the issue becomes one which must be resolved by the jury. If Berg's lawyer, Brodie, was representing Gerry and RAV Bahamas interests, Berg, who believed his lawyer was protecting him, was, in fact, unrepresented. Even if Julio did not conspire with Brodie to "set Berg up," as Julio knew that Brodie represented Gerry, who was clearly going to profit from the transaction, and he also knew that Brodie represented the company, Julio's failure to disclose this material fact would constitute fraud by omission, thereby invalidating the Agreement. Since the binding force of the Agreement is in question, it was error to grant summary judgment on the basis of either the Agreement or the release clause contained therein.
It is also important to remember that Gerry is the one who came to Berg and allegedly induced Berg to purchase Julio's shares in the company. There is record evidence from which a jury could conclude that Gerry and Julio conspired to induce Berg to purchase Julio's shares for $7 million, a grossly inflated price, and then ran their debts from other dealings through RAV Bahamas. This scheme clearly benefited both Julio and Gerry to *328 the detriment of Berg. Julio received $7 million for his shares and was able to dissolve his debts, and Gerry, who had substantially greater debt, was able to dissolve his debts while maintaining a controlling interest in the company. The company's financial records also reflect sizable "fees" flowing to Brodie, which neither Julio nor Gerry could account for. Thus, there is evidence from which a jury could conclude that Brodie, acting in concert with Julio and Gerry and as their agent, drafted the Agreement for Julio and Gerry's benefit while pretending to advise Berg and to protect Berg's interests. Under these circumstances, if proven, the Agreement may be avoided.
An agent who acts for adverse principals in a transaction is subject to a duty to act with fairness to each, and to disclose to each all facts which he knows or should know would reasonably affect the judgment of each in permitting such dual agency, except as to a principal who has manifested that he knows of such facts or that he does not care to know of them.
Quest v. Barge, 41 So.2d 158, 160 (Fla. 1949) (quoting 2 ALI Agency § 392).
The agent's disclosure must include not only the fact that he is acting on behalf of the other party, but also facts which are relevant in enabling the principal to make an intelligent determination, such as the prior relations between the agent and such other party, and the knowledge or lack of knowledge by the other party that the agent is acting for the principal.
Id. Because Brodie was admittedly Gerry's and Julio's agent, as Brodie represented the company Gerry and Julio owned and were attempting to sell to Berg, Brodie and Julio's failure to disclose this fact, constitutes a fraudulent concealment of a material fact.
In Quest, the Florida Supreme Court acknowledged the well-settled law in this state which holds that a contract procured by the fraud of an agent may be rescinded, even as against an innocent principal, Id. at 162, and further held that:
It is then the policy of the law to deny the agent and his principal the benefits of a contract executed while the agent has assumed to act for both parties without full knowledge and consent to the relation by the principal sought to be held. This rule rests upon policy and not upon the proof of injury or damage to the principal.
Id. at 163 (emphasis added). Thus, the trial court erred in granting summary judgment as to Berg's claims against Julio for rescission of the Agreement (Count IV), and the fraud claims in Counts VI and VII. See Burnham City Lumber v. Rannie, 59 Fla. 179, 52 So. 617, 620-21 (1910); Wolfe v. Aetna Ins. Co., 436 So.2d 997, 1000 (Fla. 5th DCA 1983) (holding that where an agent acts as the undisclosed agent, the entire transaction may be set aside); Taborsky v. Mathews, 121 So.2d 61, 61-62 (Fla. 2d DCA 1960) (holding that undisclosed dual agency warrants transactions being set aside).
In reaching this conclusion, I acknowledge the general principle articulated in Cerniglia v. Cerniglia, 679 So.2d 1160, 1164 (Fla.1996), that where a settlement (or a contract or an agreement) is negotiated at arms length between independent counsel and encompasses an unambiguous release, the release will bar subsequent proceedings. In the instant case, however, Berg was not represented by independent counsel and there is record evidence upon which the jury could conclude that Berg's counsel was acting in concert with Julio and Gerry to defraud Berg. Thus, the general principle articulated in Cerniglia does *329 not apply to the facts of this case nor preclude Berg's claims against Julio.
I would, therefore, reverse the order entered by the trial court.
NOTES
[1] We consolidated the appeals from these judgments with Berg's appeal from a judgment in Julio Capo's favor on his counterclaim for breach of contract and to collect on a note.